1

2                   UNITED STATES DISTRICT COURT

3                      DISTRICT OF OREGON

4             THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7             Plaintiff,             )
                                     )
8         vs.                        )No. 6:06-cr-60011-AA
                                     )
9   JOSEPH DIBEE,                    )
                                     )
10            Defendant.             )
    _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              FRIDAY, DECEMBER 13, 2019

16                  PORTLAND, OREGON

17

18

19

20

21

22                      Jan R. Duiven
                        Official Federal Reporter
23                      United States Courthouse
                        405 East Eighth Avenue
24                      Eugene, Oregon 97401
                        (541) 431-4112
25                      jan_duiven@ord.uscourts.gov

```
1

2
                              APPEARANCES
3

4    For the U.S. Government:

5         U.S. Attorney's Office
          1000 SW 3rd Avenue #600
6         Portland, Oregon 97204
          (503) 727-1000
7         BY:  MR. GEOFFREY BARROW
          geoffrey.barrow@usdoj.gov
8

9    For the Defendant:

10        Mr. Paul Hood
          Paul Hood, Attorney at Law LLC
11        P.O. Box 66876
          Portland, Oregon 97290
12        (541) 513-7545
          paul@paulhoodlaw.com
13

14   Also present:

15        Officer Noe Rios

16

17

18

19

20

21

22

23

24

25
```

```
1              FRIDAY, DECEMBER 13, 2019; 3:27 P.M.

2                            -o0o-

3

4              COURTROOM DEPUTY:  Now is the time

5    set for criminal case No. 06-60011, United States

6    of America versus Joseph Dibee for oral argument.

7              THE COURT:  Good afternoon.  If I

8    could ask you to introduce yourselves for the

9    record, I'd appreciate it.

10             MR. BARROW:  Geoff Barrow on behalf

11   of the United States.

12             MR. HOOD:  Paul Hood for Joseph

13   Dibee, your Honor.

14             THE COURT:  Okay.  Proceed, counsel.

15   I have your memos.  I have everything filed.  I'm

16   happy to hear anything you wish to add.

17             MR. BARROW:  Your Honor, we move for

18   the continued detention of Mr. Dibee pending trial

19   for all of the reasons set forth in our opposition

20   to the defendant's release memorandum.  I would

21   note that that recommendation is consistent with

22   that of Pretrial Services, which we didn't have at

23   the time of our filing.  I'd be happy to answer

24   any questions, but the basis for the detention is

25   set forth in the memorandum.
```

1          MR. HOOD:  Your Honor, I'll address

2    the issues of danger to the community and flight

3    risk.  Before I do that, I would like to turn to

4    the gallery and note that Mr. Dibee has a number

5    of family and friends here present in the

6    courtroom today.  If you are family or friend of

7    Joseph Dibee, please stand.

8          Now, all of you but the two that are

9    right here -- so I'm going to get out of the way

10   so you can see -- all of you but these two please

11   be seated.

12          Your Honor, this is Maha Coles and

13   Jeff Coles.  They are respectively the sister and

14   brother-in-law of my client.  Jeff Coles has been

15   married to Maha for now 22 years, but actually

16   knew my client before he knew Maha, and met his

17   future wife through my client.  They both provided

18   letters to the Court.  They --

19          THE COURT:  Yes.

20          MR. HOOD:  -- fully support

21   Mr. Dibee and would be his home plan if he were

22   granted pretrial release.

23          I'd also just say, briefly,

24   Ms. Coles has been a doctor for 20 years.

25   Mr. Coles has been an engineer for about the same

1    amount of time, 25 years, I guess, actually.  They

2    have strong connections to the Seattle community

3    where they reside and, again, they would be his

4    home plan.

5                    You can sit back down.

6                    THE COURT:  Thank you.  Thank you

7    for being here.

8                    MR. HOOD:  Your Honor, I will make

9    my comments relatively brief.  I've already

10   provided the Court with a second exhibit which

11   goes through the sentences and is organized by

12   counts.  I've called that Defendant's Exhibit 2.

13   Do you have that document, your Honor?

14                    THE COURT:  I have.

15                    MR. HOOD:  So the government's

16   argument is something that I would characterize as

17   essentially a genre argument.  In other words,

18   they're describing a kind of crime which is a

19   genre that should not allow for pretrial release,

20   at least as a presumption against it.  A careful

21   reader, a studious reader, could review their

22   government memo and not realize that 11 defendants

23   in this case have already resolved their cases.

24   You very well know that, and four of those

25   defendants were granted pretrial release in spite

1    of every argument the government's made.  Those

2    four defendants who were granted pretrial release

3    were all also charged with Count 1, the conspiracy

4    count.

5              That genre argument that they're

6    making, in other words, does not look into the

7    actual data that we have represented to the Court

8    in Exhibit 2.  It doesn't get into the specifics

9    of the actual outcomes of this case.

10             A reader of their memo could think

11   everyone in the case must have gotten at least a

12   ten-year sentence, and in fact that's not the

13   reality of what happened.  There -- those numbers

14   on Exhibit 2 that talk about the different counts,

15   how many counts people had and what their sentence

16   ultimately was aren't just bare-bones numbers, and

17   you know this very well.  They represent

18   thoughtful investigation, they represent

19   presentations to the Court, and they represent

20   thoughtful outcomes for those defendants.

21             What that pattern shows is stark and

22   it's very significant for the issue here.  You

23   have a collection of defendants, all of whom had

24   four or fewer charges against them in the second

25   superseding indictment, and then you have another

1    group of defendants who had a lot more charges

2    than that.  The least of them had at least 17

3    charges against them.  There's no middle ground.

4    It's two to four charges against them or 17 to 59

5    out of 65.

6              The reason why that's so significant

7    is that the way the indictment is written, you

8    have Count 1, conspiracy, with overt acts,

9    Count 2, another conspiracy, and then Counts 3

10   through 65 each reflects the various overt acts of

11   Count 1.  The more charges against a person, the

12   more active they were, the more involvement they

13   had, and, logically, most likely, the heavier

14   sentence they got.

15             Joseph Dibee is firmly planted in

16   that first group of the people with two to four

17   counts.  He has three counts against him.  And one

18   of those, and I'm just going to say this quite

19   bluntly, is a bogus count.  I brought this up to

20   the government.  I addressed it in my memo.  There

21   is no rationale why he is charged in Count 2,

22   which is the conspiracy to destroy the energy

23   facility.  That is written as a conspiracy count.

24   It probably ought to have been written simply as

25   like one of the other nonconspiracy counts in the

 1   case, just another overt act.

 2              I've reviewed discovery on this

 3   issue.  I've talked to Geoffrey Barrow -- pardon

 4   me, Mr. Barrow about this issue.  There's no

 5   explanation for why he's included in this count,

 6   which means that you really just have two counts

 7   against him.

 8              Also, your Honor, look at the gap

 9   between Count 1 -- or, pardon me, group one in

10   that exhibit and group two.  It's this huge gap.

11   The most charges -- Rebecca Rubin has four.  Then

12   you jump all the way up to Suzanne Savoie, who has

13   17 charges against her.  There's no rationale in

14   this case, and I say so explicitly in my memo to

15   the Court, why Mr. Dibee would leap out of the

16   first group and into the second.

17              And all of that sentencing

18   discussion matters, your Honor, because in this

19   district, and I suspect in most districts, someone

20   facing a sentence around 41 months or 60 months or

21   something like that, someone who already has about

22   16 months in on that sentence would often get

23   pretrial release.

24              The government's memo goes on and on

25   about danger as a kind of genre, but the specifics

1   of what we see in the case suggest that pretrial

2   release would be appropriate.  Additionally, you

3   have a significant period of time where no new

4   criminal allegation is alleged.

5                Now, the government's point is,

6   well, part of that time he's outside the United

7   States.  Okay.  Fair enough.  But what about 2002,

8   2003, 2004, and 2005?  The last allegation against

9   Joseph Dibee is from October of 2001.  Then there

10  is an end to any allegation of criminal conduct

11  and the government has no explanation for that.

12  But we do, your Honor, and that is referenced in

13  the memo.

14                Mr. Dibee changed his view, his

15  philosophy, which is now that if you want to help

16  the natural world, what you've got to do is get

17  the profit motive and good environmental practice

18  to line up so that people's desire to make money

19  fits with a good environmental practices approach.

20                All of that suggests that he is

21  not -- he does not represent a danger to the

22  community, and certainly if you look again at

23  Exhibit 2, you have four people on that exhibit,

24  your Honor, who received pretrial release:

25  Jonathan Paul had three counts against him,

1  received pretrial release; Kendall Tankersley had

2  four counts, also received pretrial release;

3  Suzanne Savoie had 17 counts against her in the

4  second superseding indictment, received pretrial

5  release; and Daniel McGowan had 18 counts against

6  him and received pretrial release.  If it's a

7  danger to the community argument that the

8  government is trying to rely upon, it just -- it

9  doesn't work.

10            Instead, their argument has to be

11  flight, and now I'm going to turn to that

12  argument.  It's spelled out in my memo, your

13  Honor, that at the time -- and, again, these

14  allegations are treated as true for the purposes

15  of this discussion -- Mr. Dibee had no pending

16  case against him.  Nothing had yet been filed.

17            I've talked to AUSA Barrow about

18  this and the best explanation that we can come up

19  with, at least the one that makes the most sense

20  to me, frankly, is that an FBI agent approached

21  Mr. Dibee hoping he could turn Mr. Dibee, hoping

22  he could flip him, and tried to intimidate him and

23  frighten him, and, frankly, there's probably a

24  degree of embarrassment for that FBI agent that

25  that didn't work out as planned.

1                    And, unfortunately, I think there's

2     a bit of aggressiveness against Mr. Dibee

3     percolating up through the system at some levels

4     because of that, because it's an embarrassment for

5     that FBI agent, because he tried and it didn't

6     work out at all.

7                    But there's no failure to appear.

8     There's no absconding.  Nothing of the sort.  And,

9     instead, while -- during that time period from

10    2005 to 2018, Mr. Dibee is engaged in a variety of

11    good works that are all spelled out for the Court

12    in the defendant's memorandum in support of

13    pretrial release.

14                   In addition, your Honor -- yes.  He

15    just whispered something to me that is a small

16    detail but if -- I think it's significant, though

17    a small detail.  He paid his taxes that he still

18    owed while he was outside the United States.  I

19    mean, aside from count -- I mean, the limited --

20    the limited participation, just the two counts,

21    there's a whole history with him of good works, of

22    good participation in society, of doing things

23    like paying his taxes, all of that which all

24    supports a notion of granting him pretrial

25    release.

```
 1                    In addition, you know, he had
 2      this -- I mean, all of this weighs in on a
 3      question of post-offense rehabilitation.  It also
 4      weighs in on a question of whether or not he would
 5      be a good performer if granted pretrial release.
 6                    Now, I recognize that Officer Rios
 7      is recommending detention, but there are a couple
 8      of details that ought to be considered when you
 9      look into that, and I've mentioned some of these
10      in the memo as well.
11                    First, he has -- he has no travel
12      documents that would allow him to travel outside
13      the United States.  Those documents were returned
14      to me as part of Mr. Dibee's property and I gave
15      them on to Ms. Coles, but we would gladly
16      surrender them.  The Syrian passport is expired.
17      The Russian identification documents are simply
18      residence documents.  They would do nothing for
19      him in terms of travel.  They wouldn't be
20      effective.
21                    And, of course, the Court has the
22      option of putting him on house arrest or other
23      forms of monitoring.  There are options available
24      to the Court short of detention that would be
25      quite effective for him.  So you don't have to
```

1   follow -- follow that recommendation and the

2   recommendation doesn't acknowledge the fact that

3   he doesn't have much of an ability to travel.  It

4   simply relies on the fact that he has foreign

5   connections.

6              But we all should know he was born

7   in Seattle.  He was born in Washington state.

8   He's a citizen of the United States.  Though he

9   does have foreign ties, he has domestic ties as

10  well.  And he has an extraordinarily good home

11  plan if permitted to take advantage of that.

12             There are two other points that I

13  will make briefly, your Honor.  One is -- and I've

14  worked with -- and against, I should say.  I've

15  worked against Mr. Barrow before in previous

16  cases.  I have a good working relationship with

17  him.  But there's something in the government's

18  memo that I don't want to let go of and it's in

19  the very first paragraph and it's repeated later

20  in the motion.  And it's when it's referenced that

21  Mr. Dibee was traveling under a Syrian passport in

22  a different name.

23             Now, I would like to assume the best

24  and be optimistic about this, but whether I'm

25  assuming the best or the worst, I'm not going to

1    leave that unrebutted.  The Syrian passport is in

2    the name Yusef Diba (phonetic) which is simply the

3    Arab Syrian version of Joseph Dibee.  It would be

4    no different than if I had ancestors from Italy

5    and I moved to Italy, and instead of going by

6    Paul, my first name, I went by Paulo.  It is no

7    different.

8                    I've spoken to Ms. Coles about this.

9    She agrees.  This is simply the Arab version of my

10   client's name.  It is not an alias.  It is nothing

11   nefarious.

12                   And the thing that bothers me about

13   this, and I just -- I've thought carefully about

14   my words and I want to be diplomatic, but my

15   opinion is that AUSA Barrow must have known that.

16   It must have -- he's intelligent.  He's

17   insightful.  He must have realized that Yusef and

18   Joseph are awfully close, and Dibee and Diba, I

19   may be mispronouncing that, those names are very

20   close just as you look at them on the page.

21                   The government has pointed to that

22   like it's something that can sway you.  It's kind

23   of like a one-line throwaway, and it shouldn't be

24   used in that way.

25                   I would point out, secondly, your

1    Honor, I want to zero back in on Exhibit 2 for a

2    moment.  You have Jonathan Paul who has three

3    counts against him, which is exactly the same

4    number of counts that Mr. Dibee had against -- has

5    against him.  Jonathan Paul got a sentence of

6    41 months in this case.  He was granted pretrial

7    release.  And it's not just the three counts.

8    It's the same counts.  It's Counts 1, 2, and 6.

9    And Count 2 was just as bogus against Jonathan

10   Paul as it is bogus against Mr. Dibee.

11              Jonathan Paul was granted pretrial

12   release and the government gave Jonathan Paul a

13   17-level downward departure.  I don't know what he

14   ultimately got, but that was their recommendation

15   out of the government's own sentencing memorandum.

16   I don't know the details of that cooperation.  I

17   don't know the details of that assistance.  But I

18   believe it probably related to those serious

19   crimes, crimes that involved destruction of

20   property.

21              (Off-the-record discussion.)

22              Whatever the level -- whatever the

23   level of cooperation or noncooperation here, in my

24   memo to the Court, we detailed the risks that

25   Mr. Dibee has taken, risks involving very serious

1   issues, I suspect much more serious than anything

2   Jonathan Paul dealt with, and the risks to

3   Mr. Dibee -- again, and I think the Court can

4   imagine them, much more serious than anything

5   Jonathan Paul faced.

6               And I can't imagine that the

7   government's position is that Jonathan Paul,

8   helping with serious, but ultimately

9   property-related -- property destruction, sabotage

10  kind of offenses, would ever justify something

11  more than the consideration that Mr. Dibee should

12  receive, your Honor.

13              And with that, I just want to say my

14  client has also prepared brief remarks and would

15  like to present those to the Court, your Honor.

16              THE COURT:  Happy to hear anything

17  you wish to tell me.

18              THE DEFENDANT:  Well, your Honor --

19              THE COURT:  You're going to need to

20  speak loudly into the microphone.  I apologize.

21  The courtroom has some dead spots and the court

22  reporter will need to be able to take down what

23  you have to say.

24              THE DEFENDANT:  I've taken the

25  opportunity to read the memo and I'd like to take

1    this opportunity to counter any of the gross

2    misrepresentations, mischaracterizations of me put

3    forth by the prosecution as I stand here before

4    this Court.

5                    First of all, I want to say that the

6    charges are literally three lifetimes ago.

7                    THE COURT:  The charges -- say that

8    again.

9                    THE DEFENDANT:  The charges leveled

10   against me are from three lifetimes ago.  You

11   know, there are three different countries.

12   They're three different languages.  They're three

13   different cultures ago.  And, you know, as time

14   goes by, people develop.  They develop

15   intellectually, they develop socially, they change

16   their persona for the better, I should hope.  And

17   I can't say that I'm the same person today that I

18   was a year ago.  I -- certainly not two decades

19   ago.

20                    I don't understand how these claims

21   can be made after 20 years that I'm this person

22   when, you know, literally people change --

23   hopefully change for the better over time and, you

24   know, that was 20 years ago.

25                    You know, as we grow, we incorporate

1    the things that work into our -- our life and we

2    learn from our mistakes, and for many years, even

3    before I was indicted, I felt that direct action

4    and protests and such don't really work, and they

5    don't work because there's money behind them.

6    There's money behind the actions being protested.

7                    So it seemed to me that the best way

8    to effect change, positive change, was to make

9    good environmental practices, good financial

10   practices, and that's what I've tried to do for

11   the last 15 years of my life.  I point out that

12   many people do that in different ways.  I'm an

13   engineer by training and sort of a computer person

14   by whatever necessity.  So the types of changes

15   that I've tried to implement are ones that go

16   along with the skill sets that I have which are

17   technological.

18                    I'd like to describe a couple of

19   projects that I've worked on over the last

20   15 years, you know, which I think embody the

21   principles that I believe in and certainly

22   contradict what's -- what's written in this memo

23   here.

24                    The first project I'd like to

25   describe is the Syrian solar thermal project which

1   I designed and authored.  It was a sort of

2   outgrowth of my work at the university where I

3   taught.  Originally, when I got into Syria, the

4   government made me an offer.  The offer was:  Do

5   you want to help your country and your family?  Of

6   course there was a right answer, wrong answer.

7   Thankfully, I got the right answer.

8                    So I took this job at the university

9   teaching computer science and eventually I

10  branched out into environmental and renewable

11  energy systems.  Originally the government wanted

12  us to study wind turbines because they're

13  relatively cheap.  They make cheap power.  But as

14  time progressed, I was able to persuade them to

15  look at solar energy.

16                   Now, solar thermal is quite

17  different than what most people associate with --

18  with solar power.  Basically what you do is you

19  concentrate heat from the -- from the energy of

20  the sun onto a line or a -- or a pipe and then in

21  the pipe you flow a heat exchange medium which is

22  then turned around and boils water or, you know,

23  organic solvent and, in turn, turns a turbine.

24                   The project was slated to produce

25  35 percent of the entire energy of the entire

1    country.  And as a byproduct of that, we

2    desalinate water.  Syria is a very dry country.

3    The water comes once every three days.  And so

4    having a good source of clean drinking water is

5    super important.  For every one megawatt of power

6    that the power plant would produce, it would

7    produce 5 million gallons a day.  The power plant

8    eventually was slated to become 600 megawatts in

9    size.  We had gotten to the point where we had a

10   prototype, but the war started before we could

11   produce a pilot project.

12                  Seven million people would have

13   been -- would have received power from this plant,

14   and as well as jobs.  And the impetus behind the

15   project was the Syrian government wanted to join

16   the EU and that was their sort of forefront or

17   thrust into EU.  Part of the rationale was -- is

18   that in order to join the EU, they needed to

19   acknowledge and abide by the Kyoto Affair, Kyoto

20   Protocols, which were global warming, greenhouse

21   gas control thing, and as well as abolish the

22   death penalty and acknowledge the existence of

23   Israel.

24                  My job in all that was to bring some

25   renewable energy systems into the country that --

1    that could accomplish that.  And I believe that
2    had -- had I not been caught up in the war, had I
3    not been forced to flee like one out of every --
4    one out of every five people who are refugees,
5    excuse me, I think that the project would have
6    been very successful and helped a lot of people.
7                I think it also demonstrates the
8    basis which I referred to earlier in that good
9    environmental policy comes from good economic
10   policy.  The project as a whole would have
11   produced electricity at a rate slightly higher
12   than burning coal.  Syria, at the time, was
13   burning natural gas and so they would have
14   experienced a substantial savings financially, in
15   addition to doing the right thing environmentally.
16               So it goes toward that philosophy
17   that I have and the belief that I have.
18   Unfortunately, it was curtailed by the war.
19               I'd like to also talk about my work
20   in Ecuador.  While I was living in Russia, I ended
21   up working -- going on a kayaking trip with the
22   intent of finding work in Ecuador.  There are a
23   variety of reasons why -- why I did that.  Russia
24   was very difficult to find work.  My wife and I
25   wanted to have a child and it just -- we didn't

1   have enough sources of income within Russia to do

2   that responsibly.  Russia imports a lot of

3   materials so things that are very inexpensive,

4   like computers and shoes and clothes and whatever

5   in the United States are actually very expensive.

6   In Russia, they have an import duty of 42 percent.

7   So I needed to find some other source of income

8   outside of Russia and I thought to go to Ecuador

9   to do that.

10                  While I was there, I met a friend of

11  a friend of a friend who's Douglas MacKinnon, and

12  he is essentially like the Bill Gates of mining in

13  South America.  And he -- we were talking and

14  talking and he said, "Well, I'm a miner."  And I

15  thought, Well, aren't there a lot of environmental

16  problems associated with that?  And he said,

17  "Well, yes, of course."

18                  You know, and we have these

19  problems, like I work with a number of different

20  people, including indigenous people in the Amazon

21  rain forest, and they're what we call artisanal or

22  hobby miners, and essentially there are

23  small-scale families, very poor families, people

24  who really haven't been exposed to western culture

25  up until about 30 years ago, 35 years ago.  They

1    don't have any source of income.  And as a result

2    of development around them, they're no longer able

3    to maintain a subsistence way of lifestyle and so

4    they've gone to gold mining.

5                     But the way they mine gold is

6    through the use of mercury.  Mercury's a very

7    toxic element.  It doesn't degrade.  It doesn't

8    biodegrade.  It's an element.  It's just -- it's

9    there.  It bioaccumulates up the food chain and

10   poisons everything along -- you know, along its

11   path.  It causes birth defects, very severe birth

12   defects, at even very, very low quantities.

13   There's no safe level of mercury and yet these

14   people use it daily to separate gold from ore.

15                     Basically, mercury's a very heavy,

16   dense material that's a liquid and you put -- you

17   grind up the ore, you throw it in the mercury, and

18   the gold will sink and everything else floats.

19   They take all the stuff that's floating and they

20   scoop it off and do it again.  And at the end of

21   the day at the bottom of the barrel, there will be

22   some gold.

23                     Well, there's also mercury on their

24   clothes.  They bring that home and, you know,

25   their whole families end up with mercury

1   poisoning.  Everything downstream of those areas

2   has mercury in it.  Mercury permeates those

3   watersheds.

4                   And so the machine that I

5   developed -- in talking with Douglas, he explained

6   this problem to me.  The machine I developed

7   doesn't use mercury.  And to -- advantageously, I

8   would say that mercury is about 60 percent

9   efficient at doing what it does, which means that

10  40 percent of the gold that goes into the tub of

11  mercury ends up coming out of the tub of mercury.

12  So it's lost.

13                  I produced the mechanical separator.

14  It's called an helictical (phonetic) separator.

15  It's a class of machines.  I produced an instance

16  of it.  The communities that we were talking

17  about, they don't have roads into them.  So you

18  can't just buy a machine and drag it there by a

19  semi-truck.  It has to be disassembled, floated

20  down the river, walked up a trail and into the

21  Amazon rain forest.

22                  (Reporter inquiry.)

23                  THE DEFENDANT:  Helictical

24  separator.

25                  It's basically if you can imagine a

1    corkscrew inside of a tube.  Right?  And so the

2    way the machine works is that the corkscrew turns

3    and ore is ground up, added to water, and then

4    pushed down the tube.  So you can imagine if the

5    tube was straight up and down, everything would

6    flow out the bottom.  Right?  If the tube was

7    horizontal, everything would precipitate out of

8    the water and into the -- into the bottom of the

9    tube.

10                  So somewhere between here and there

11   is the point where only gold ore precipitates out.

12   As the gold precipitates out, it hits the screw,

13   and the screw is turning and it pushes it up the

14   tube and into a barrel.  There's no chemicals

15   involved whatsoever.  And this particular class of

16   separator has an efficiency of 85 to 90 percent,

17   and that depends on the angle that I clip the tube

18   at.  So we have 60 percent with mercury and 80 to

19   90 percent with the mechanical separation that

20   I've designed.

21                  I went to Douglas and I said, "Hey,

22   you know, here's what I can do.  Why don't you go

23   to these communities and, say, 'We'll give you

24   10 percent above what you're making right now with

25   the mercury.  You keep the rest of it.  Right?

1    And you produce and bring this machine to them."

2    And that way, the indigenous people do not get

3    poisoned, the watershed doesn't get poisoned.  The

4    indigenous people make more money and the mining

5    company makes money.  Everybody wins.  There are

6    no losers in the equation.  Again, it goes back to

7    my philosophy, which is good environmental

8    practices can also be good financial practices.

9              In conclusion, I -- the other part

10   of that is that Mr. McKinnon described to me a

11   problem which he is having.  So that problem would

12   have been solved in Ecuador except for I needed to

13   do the hydraulic modeling, the computational fluid

14   dynamics to figure out the angles and the pump

15   rates.  They're very complicated problems.  There

16   are actually -- no computer capable of doing that

17   in Ecuador.  As it turns out, I happened to have

18   one of those computers in my home in Russia for

19   some other work that I was doing.

20             And so I collected this data and I

21   go home to Russia and model the problem and send

22   an AutoCAD to a local machine shop which was going

23   to produce the machine.  Unfortunately, I was -- I

24   ended up getting kidnapped in Cuba.

25             The other problem that was described

1    to me was one of a cyanide leach pond, and cyanide

2    leach ponds are the byproduct of industrial

3    mining.  There are a number of them littered

4    around Ecuador.  And basically the way it works in

5    industrial mining you take a bunch of ore, you

6    grind it all up, and you soak it with cyanide

7    water solution.  The cyanide dissolves the gold

8    out of the dirt and then the liquid is recovered

9    and about 95 percent of the gold that's in

10   solution is pulled out.

11              During my time in Sheridan and

12   Inverness, I was able to contact a friend of mine

13   who works at the university in Indiana, and I had

14   him do some research or provide me with some

15   research that I was looking for, and I believe

16   that I developed an industrial process which makes

17   the mining company a lot of money and is based on

18   a biological process.  It's biological in nature.

19   Well, it's a fairly complicated biological

20   process.  But it -- for the end user, it's very

21   simple and it's very inexpensive and it makes -- I

22   would say the days of cyanide leach ponds are

23   numbered.

24              Mr. McKinnon was quite excited by my

25   discovery.  My discovery's based in fact.  It's

1  not some harebrain thing that I came up with.

2  It's based on numerous different pieces of data

3  from scientific journals that are peer reviewed,

4  and I'm very confident that that will become an

5  industrial process at some point.  It has the

6  advantage of not only being cheap to do but

7  profitable for these mining companies to actually

8  clean up abandoned cyanide leach ponds.

9              Cyanide leach ponds are very

10  dangerous, particularly in the Amazon where it

11  rains a lot.  The cyanide, when it's in solution,

12  stays in solution only when the pH of the liquid

13  is above 9.5.  Rainwater is between 7 and 8.

14  So -- and, of course, in the Amazon it rains a

15  lot.  Right?  So these ponds are typically like

16  earthen dams and the liquid in the dam rises as

17  the rain comes down, of course, and the pH goes

18  down.

19              Now, the problem is is that when

20  cyanide -- the ion cyanide hits a pH of less than

21  9.5, it takes a proton from the water and produces

22  hydrogen cyanide, which is very toxic gas and for

23  which there is no antidote.

24              Additionally, occasionally you'll

25  hear, like even if you believe in Colorado where

1   these dams have been breached and they pour

2   cyanide into the watersheds and destroy everything

3   in their path.  I believe the process that I've

4   developed resolves all of that.

5                    So I would hope that in the event

6   that I get pretrial release of some form that I

7   could continue that research and finalize the

8   industrial process that I'm working on.  So I

9   think that part of the reason -- or main reason

10  that I chose to share these -- these particular

11  projects is I wanted the Court to understand that

12  this person is not me.  (Indicating.)  You know,

13  this is who I am.  This is what I believe.  And a

14  lot of people say that, I'm sure, in court, but

15  I've actually spent a decade and a half proving

16  that.  Thank you for your time.

17                    THE COURT:  Mr. Barrow.

18                    MR. BARROW:  Very briefly, your

19  Honor.  It's clear that Mr. Dibee is someone that

20  could make contributions to our society, valuable

21  contributions, but he was not living in Russia and

22  Syria for business opportunities.  He wasn't there

23  for the research opportunities that were afforded.

24  He clearly knew of the charges against him.  He

25  was informed of those -- of the evidence that the

1    government had and he fled.

2                    He undoubtedly knew that Russia and

3    Syria do not have an extradition treaty with the

4    United States.  And repeatedly he was only willing

5    to come back to the United States if the

6    government dismissed the charges against him.

7                    And, finally, he was not kidnapped

8    in Cuba.  He was arrested on an arrest warrant out

9    of this district.

10                    We'd ask that he remain detained

11   both as a danger to the community and a risk of

12   flight.  Thank you.

13                    MR. HOOD:  Your Honor, just on the

14   last two points.  You can understand how someone

15   traveling would -- with the treatment that he has

16   described in some small part in my memo would

17   describe the Cuban situation as kidnapping.

18                    But also the -- I mean, and I talk

19   about this in the memo, the Syrian connection for

20   Joseph Dibee is that's his -- he had family there.

21   I mean, it's not that he's making some big plan

22   out of this.  And there's nothing nefarious about

23   the Russian connection.  It's all described in the

24   memo.

25                    I think enough has been said on

1    this.  I will not belabor the Court anymore except

2    to say that once you pierce the genre argument

3    about how serious the charges are and you start

4    looking at the sentences people actually got, the

5    fact that people got pretrial release, listening

6    to what Mr. Dibee has to say and the contributions

7    he can make, he is an extremely good candidate for

8    pretrial release supervision short of detention,

9    your Honor.  Thank you.

10            THE COURT:  I don't believe the

11   government's met its clear and convincing burden

12   in this instance and I'm going to release the

13   defendant under a constellation of obligations

14   that I believe will ensure that he will be present

15   for the next stages of his case, and I'm also

16   going to set as a matter of course regular status

17   conferences to move this case forward.

18            He was brought here in August of

19   2018, and it is now December of 2019, and this

20   case is yet to resolve or be set for trial.  That

21   concerns me.

22            So I've read everything.  I took a

23   look at the letter from his sister, and careful

24   what his sister wishes for.  Your sister is highly

25   regarded.  Her offer to have you stay in her home

1   and with her -- your brother-in-law and family is

2   significant to the Court.  She has enormous ties

3   and a professional responsibility in that

4   community that's significant.

5                    And what I'm going to tell you

6   straightaway is your -- what's most important is,

7   however this case resolves, trial or a change of

8   plea, I know every single one of the cases by

9   heart.  I spent an entire summer doing sentencings

10  in these cases and I'm prepared to address when we

11  get to the stage if that should happen a number of

12  the issues.  I know this case inside out.  It

13  needs to be resolved.  It needs to be finished.

14                   And I'm going to count on you, on

15  the constellation of release conditions that I'll

16  put in place, that you are a different person, and

17  I have found that to be the case with a number of

18  the individuals who have come into court,

19  including -- I can name some who were released who

20  were in another country for some time and who

21  matured, shall we say.  They're in their

22  intellectual -- a look at how they were going to

23  take on issues.

24                   So I'm going to give you that

25  acknowledgment today that I think you are a

1    different person and you have enormous skills to

2    provide and can do that while you're on pretrial

3    release under these conditions.

4                    And that you will appear, you will

5    cooperate with your lawyer to get this case

6    resolved, and hopefully move this case forward.

7                    The easy thing for me to do would be

8    to hold you in custody, and that goes to credit

9    for whatever time you may be obligated to serve,

10   and so by being out it essentially means that that

11   time doesn't count.  So the easy thing would have

12   been to hold you, but I believe under what my

13   obligation is that there's a -- the government

14   didn't, in my opinion, meet its burden, and there

15   has to be a constellation of obligations that you

16   must meet in order to stay in the community.

17                   And I'm going to -- I'm going to

18   take you at your word that you will honor those

19   and you will comply and be in court.  Yes, you're

20   facing time in custody, but you're also facing any

21   number of problems if you -- if you decide that

22   you are not going to comply with my order.

23   Because, again, I won't forget.

24                   And what I tell people when I

25   release them when I do a change of plea or I

```
 1   release them pending sentencing, that you -- this
 2   is a very important period of time that a Court
 3   looks at to see whether you can comply with the
 4   orders.  Do you understand?
 5                   THE DEFENDANT:  Yes, ma'am.
 6                   THE COURT:  So all your
 7   transportation, all your travel, passports, any --
 8   anything that remains shall be turned over to the
 9   government for their keeping.
10                   You will be on house arrest.  You
11   can have permission from pretrial to go to -- go
12   to the libraries or go if you need -- if you're
13   doing research, they'll have some limitations.  If
14   you have appointments to meet, they will give you
15   some leeway.
16                   You are to have an ankle bracelet so
17   we know where you are.  You'll have a check-in
18   with your probation -- with the pretrial officer
19   on a regular basis.  And to the extent that you
20   can -- you're not -- your attendance is not waived
21   for pretrial conference because you're not needed
22   here as we set some status conferences to move
23   this case along, you'll either be waived or you'll
24   need to be here.
25                   Other conditions that you think
```

1    might be helpful?

2                    MR. BARROW:  Your Honor, we'd ask

3    that he have no contact with codefendants or

4    government witnesses.

5                    THE COURT:  No contact with the

6    codefendants in this case, and you know who they

7    are.

8                    THE DEFENDANT:  (Nods.)

9                    THE COURT:  Anything else?

10   Pretrial, anything else?

11                   OFFICER RIOS:  Your Honor, just a

12   couple of questions.  Another condition of weapon

13   restrictions.

14                   THE COURT:  Of what?

15                   OFFICER RIOS:  No weapons or

16   firearms.

17                   THE COURT:  No weapons or firearms.

18                   OFFICER RIOS:  And is travel going

19   to be limited just to the western district of

20   Washington?  Since his sister resides in --

21                   THE COURT:  He's to reside with his

22   sister.  That was the request made.  Reside with

23   his sister.  And I'm sure you'll have courtesy

24   supervision from the Seattle office and they're --

25                   OFFICER RIOS:  That's correct.

```
 1                    THE COURT:  I mean, I have any
 2   number of folks who are out of that Seattle area
 3   and were supervised in this manner out of Seattle,
 4   so I'm sure that that will be done as a courtesy
 5   to us.
 6                    Again, you put -- you've -- if you
 7   are -- comply with this order, we move this case
 8   forward and we're at sentencing, I will tell you
 9   that will do a great deal in terms of how I look
10   at this case.  And if you decide that you're going
11   to try to make a run for it, as we tell people,
12   we're pretty good at finding people so you don't
13   want to do that.
14                    And I'm going to take you at your
15   word that you'll come back here because you're
16   back here now.  How you got back here -- and I
17   read -- I've read the lengths of some of the
18   discussions that were there and I don't need to go
19   into that.  There was some effort.  But you're a
20   Syrian citizen.  People travel the world.  I
21   understand that.  You knew there were charges.
22   You could have come back and dealt with them.  I
23   know for a lot of people there were some
24   difficulties in having those discussions.  But
25   you're here now and this is -- you're going to
```

```
 1   face this and we're going to move through it and

 2   resolve it one way or another.

 3                  And my pressure points will be on

 4   the lawyers to move this case because it's been --

 5   frankly, it's been on hold too long.

 6                  So I'd like to set a status

 7   conference.  Cathy, can you give us a date maybe

 8   in the beginning of the year when I'm going to be

 9   up here to see where we are?

10                  COURTROOM DEPUTY:  Status conference

11   is set for January 13, 2020, at 2:30 p.m.

12                  THE COURT:  I'd like -- again, can

13   you tell me any other conditions?  Or I guess he

14   doesn't know -- I expect him to be around home.  I

15   expect he'll have a computer, be able to work on

16   it.  There will be -- I want to have a computer

17   provision in there that the probation or pretrial

18   will review if there's anything on the computer or

19   reason to believe you're communicating with

20   somebody that you shouldn't be communicating with

21   or -- you know, they'll have access to your

22   computer.  But to be honest, I'm hopeful that you

23   will take this time and finish your projects.

24                  THE DEFENDANT:  Thank you.

25                  THE COURT:  Again, that's -- that's
```

1   the way in which -- when you look at sentencings:

2   Punishment, or I call it accountability,

3   rehabilitation, community safety, and other

4   factors that weigh in, that finishing the projects

5   that you're doing that -- over the last ten years

6   or so that you've changed what you're doing, that

7   will be important.

8            So I would -- I would hope that

9   that's how you would spend your time and let your

10  lawyers resolve the case and we'll be back here

11  and finish this up.

12           I appreciate what you had to say.  I

13  listened very carefully.  But I also listened very

14  carefully and read very carefully the reports from

15  both sides.  So at this point you have a lot to --

16  you have some honor you need to meet with this

17  Court and with the government, and you've made, I

18  think, a really strong statement about a good

19  environmental practice should also be a good

20  economic practice.

21           I think you -- from everything I

22  read in these cases, that's a 180-degree turn from

23  how people started in this particular case and I

24  think you've figured out a contribution that you

25  can make for -- for the betterment of many number

```
1   of people and that will give you an opportunity to
2   do that and to resolve this case at the same time.
3                  So don't abuse the -- the ability to
4   go make this difference right now and to meet the
5   obligations that I've put in place for you.  All
6   right?
7                  THE DEFENDANT:  Yes, ma'am.
8                  THE COURT:  Is there anything else
9   you think we need?
10                  OFFICER RIOS:  One last thing we
11   need.
12                  THE COURT:  Sure.
13                  OFFICER RIOS:  Since location
14   monitoring is going to be installed, would your
15   Honor like the defendant to be rolled out for
16   Monday since he is at Columbia County or would you
17   like him released from Columbia County, go to
18   Seattle, and report to pretrial services?
19                  THE COURT:  I think we can have
20   him -- if there's people that can take him to
21   Seattle, go to Seattle and have the ankle bracelet
22   put on in Seattle.
23                  OFFICER RIOS:  He's at Columbia
24   County so he'd be released from Columbia County
25   and into Seattle.
```

```
 1                    THE COURT:  Yep.
 2                    OFFICER RIOS:  Okay.  Thank you.
 3                    THE COURT:  And will that -- I think
 4    probably accommodates everybody's needs.  And
 5    he'll report -- he's to report directly to the
 6    probation office, pretrial office in Seattle.  Get
 7    the ankle bracelet on.  Give them all the
 8    information so there's all the contact.  It gives
 9    you a few minutes, a little bit, to make an email
10    to Seattle to expect him and he should be in there
11    first thing Monday --
12                    OFFICER RIOS:  Thank you, Judge.
13                    THE COURT:  -- to get that
14    accomplished.
15                    Is there anything else?  Are we -- I
16    heard just a brief, when we met, just a brief
17    discussion about discovery.  Are there discovery
18    issues?  Is there something more I need to help
19    with today?
20                    MR. BARROW:  As I noted before, your
21    Honor, I'm not aware of any outstanding discovery,
22    your Honor.  Mr. Hood and I will talk about them
23    and I'm sure we can get them resolved.
24                    MR. HOOD:  That's correct, your
25    Honor.
```

1                     THE COURT:  Okay.  So please get

2      this on my calendar if I need to do something

3      before our next session.  If not, I hope to hear

4      some progress at the next time we meet.  All

5      right?

6                     MR. HOOD:  All right.

7                     THE COURT:  Anything else?  All

8      right.  We're in recess.

9                     (The proceedings recessed at

10                     4:14 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE

4

5      I hereby certify that the foregoing is a true

6 and correct transcript of the oral proceedings had

7 in the above-entitled matter, to the best of my

8 skill and ability, dated this 16th of December,

9 2019.

10

11

12

13

14

15                 JAN R. DUIVEN, CSR, FCRR, CRC

16                 Certified Realtime Reporter

17

18

19

20

21

22

23

24

25